Filed 10/29/20  Novaresi v. County of Placer CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| PAUL NOVARESI et al., | C086209 |
| Plaintiffs and Appellants, | (Super. Ct. No. SCV0038667) |
| v. | |
| COUNTY OF PLACER et al., | |
| Defendants and Respondents;<br>SIERRA COLLEGE PARTNERS,<br>Real Parties in Interest and Respondent. | |

SUMMARY OF THE APPEAL

Appellants Paul and Carla Novaresi appeal the trial court's denial of the Petition

for Writ of Mandate they filed against Respondents County of Placer and the County of

Placer Board of Supervisors (together, the County).  Appellants argue the County erred in

taking actions to approve Real Party in Interest Sierra College Partners's proposed

1

project, the Park at Granite Bay (the project). Appellants' arguments fall into four categories. First, they argue the County violated the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.; unless otherwise stated, statutory section references that follow are to the Public Resources Code) when it certified the Environmental Impact Report (EIR) for the project. Second, appellants argue the County violated state planning and zoning laws (Gov. Code, § 65000 et seq.) and the Subdivision Map Act (Gov. Code, § 66410 et seq.) when it approved the project and took actions to allow the project to move forward. Third, appellants argue the County abused its discretion and violated Government Code section 65906 and Placer County Code section 16.04.130 when it approved a variance for some of the lots in the project. Fourth, appellants argue that the project violates County fire codes and provisions of California Fire Code applicable to fire access roads. We decide the appellants contentions are without merit and affirm the trial court judgment.

FACTS AND PROCEEDINGS

*The Proposed Project*

The project is the development and construction of "a residential subdivision of 56 single-family residential units on a 16.3-acre project site in the community of Granite Bay in Placer County, California." The project includes a 0.81-acre community park that would be open to the public. "Ingress/egress to the project site would be provided by a single gated access at the project's midpoint along Sierra College Boulevard," which runs along the eastern edge of the project site. A secondary gated access point to and from Eckerman Road, a private road which runs along a portion of the project site's western edge, "would be available for use only by emergency vehicles or by area residents during an emergency." The residential units would be a mix of one- and two-story homes on lot sizes ranging from 7,150 to 17,196 square feet. Fourteen of the lots within the project would be deed restricted to allow only single-story homes. Project construction will

2

"include installation of a water quality detention basin on the northwest side of the project to regulate peak stormwater flows from the project site."

The proposed project site is located in an "island of unincorporated area" in the County of Placer, on the western edge of Granite Bay, adjacent to City of Roseville Streets and land. Other portions of land within the island are used for houses on large lots, homes on smaller lots, scattered outbuildings, and a Montessori school; or remain "vacant, undeveloped open space with trees and natural drainage areas."

Prior to project approval, the project site was "zoned Residential-Single-Family within an Agriculture combining district and Building Site combining district with a minimum lot size of 40,000 square feet." The project site was comprised of seven parcels, with one parcel containing "a house, barn, and septic system and the remaining parcels [were] undeveloped." The existing buildings "would be removed as part of project construction."

*Administrative Approval and Proceedings Below*

"A Notice of Preparation and Initial Study (NOP/IS) for the EIR was filed with the State Clearinghouse on February 6, 2015," providing "responsible agencies and interested persons with . . . information describing the proposed project and its potential environmental effects" and the opportunity to make comments "as to the scope and content of the information to be included in the EIR." The comment period for the NOP/IS ended on March 9, 2015.

The County filed the Draft EIR with the State Clearinghouse on December 30, 2015, and the State Clearinghouse set an official 45-day public review period for the Draft EIR to end on February 16, 2016. The County Planning Commission received oral testimony regarding the Draft EIR in late January 2016. On June 30, 2016, the County released the Final EIR.

On August 25, 2016, the County Planning Commission held a public hearing regarding the proposed project and recommended the Board of Supervisors take the following actions:

1.  Certify the Final EIR and adopt a Mitigation Monitoring and Reporting Program regarding measures identified in the Final EIR as capable of mitigating possible environmental impacts the project might cause;

2.  Adopt a resolution to amend the Granite Bay Community Plan to change the site's land use designation from Rural Low Density Residential to Medium Density Residential;

3.  Adopt an ordinance to rezone the parcels in the project site from residential-single-family within an agriculture combining district and building site combining district with a minimum lot size of 40,000 square feet to residential-single-family, combining a minimum building site of 7,000 square feet;

4.  Approve a vesting tentative subdivision map; and

5.  Approve a variance to increase the maximum building coverage allowed per single-story residential units on lots that are 8,000 square feet or less from 40 percent to 50 percent.

The Board of Supervisors adopted the Planning Commission recommendations on October 11, 2016.

Appellants filed their petition on November 10, 2016.  After considering briefs and oral arguments by the parties, the superior court issued a judgment denying the petition on November 17, 2017.  Appellants filed a notice of appeal on December 26, 2017.

DISCUSSION

I

*The County Did Not Violate CEQA When It Approved the EIR*

Appellants challenge the EIR analysis and findings in three areas: hydrology, traffic, and consideration of consistency with land use plans. The County acted in good faith, and it identified and analyzed a reasonable scope of data in reaching its conclusions on these topics. Moreover, the EIR's findings regarding hydrology, traffic, and plan compliance are supported by substantial evidence.

A.    *CEQA and Judicial Review of CEQA Determinations*

In reviewing CEQA cases, we look at both the CEQA statute and CEQA Guidelines (Cal. Code Regs., tit. 14, § 15000 et seq.), which are entitled to great weight. (*In re Bay–Delta* (2008) 43 Cal.4th 1143, 1163, fn. 7 (*Bay-Delta*).) "CEQA was enacted to advance four related purposes: to (1) inform the government and public about a proposed activity's potential environmental impacts; (2) identify ways to reduce, or avoid, environmental damage; (3) prevent environmental damage by requiring project changes via alternatives or mitigation measures when feasible; and (4) disclose to the public the rationale for governmental approval of a project that may significantly impact the environment." (*Cal. Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369, 382.) The Legislature intended CEQA "to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 390 (*Laurel Heights*).)

When a proposed project triggers CEQA requirements, CEQA review is undertaken by a lead agency, defined as "the public agency which has the principal responsibility for carrying out or approving a project which may have a significant effect upon the environment." (§ 21067; see also *Friends of the Eel River v. North Coast*

*Railroad Authority* (2017) 3 Cal.5th 677, 712-713.) "The EIR has been aptly described as the 'heart of CEQA.' [Citations.] Its purpose is to inform the public and its responsible officials of the environmental consequences of their decisions before they are made." (*Citizens of Goleta Valley v. Bd. of Supervisors* (1990) 52 Cal.3d 553, 564, italics omitted (*Goleta*).) It "is the primary means of achieving the Legislature's considered declaration that it is the policy of this state to 'take all action necessary to protect, rehabilitate, and enhance the environmental quality of the state.' [Citation.] . . . An EIR is an 'environmental "alarm bell" whose purpose it is to alert the public and its responsible officials to environmental changes before they have reached ecological points of no return.' [Citations.] The EIR is also intended 'to demonstrate to an apprehensive citizenry that the agency has, in fact, analyzed and considered the ecological implications of its action.' [Citations.] Because the EIR must be certified or rejected by public officials, it is a document of accountability. If CEQA is scrupulously followed, the public will know the basis on which its responsible officials either approve or reject environmentally significant action, and the public, being duly informed, can respond accordingly to action with which it disagrees. [Citations.] The EIR process protects not only the environment but also informed self-government." (*Laurel Heights*, *supra*, 47 Cal.3d at p. 392.)

"Where an EIR is challenged as being legally inadequate, a court presumes a public agency's decision to certify the EIR is correct, thereby imposing on a party challenging it the burden of establishing otherwise." (*Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 530 (*Sierra Club*).) "Section 21168.5 provides that a court's inquiry in an action to set aside an agency's decision under CEQA 'shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' As a result of this standard, '[t]he court does not pass upon the correctness of the EIR's environmental

conclusions, but only upon its sufficiency as an informative document.' [Citation.]" (*Laurel Heights*, *supra*, 47 Cal.3d at p. 392.) We will not set aside an agency's approval of an EIR on the ground that a different conclusion would have been equally or more reasonable. (*Goleta*, *supra*, 52 Cal.3d at p. 564.)

Our review in a CEQA case, as in other mandamus actions, is the same as that of the trial court. We review the agency's decision, not that of the trial court. (*Bay–Delta*, *supra*, 43 Cal.4th at p. 1162.) Such review differs according to the type of error claimed. (*Vineyard Area Citizens for Responsible Growth v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 435.) "Whether an 'agency has employed the correct procedures,' is reviewed 'de novo . . . "scrupulously enforc[ing] all legislatively mandated CEQA requirements" [citation]. . . .' [Citation.] But an 'agency's substantive factual conclusions' are 'accord[ed] greater deference.' [Citation.] 'In reviewing for substantial evidence, the reviewing court "may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable," for, on factual questions, our task "is not to weigh conflicting evidence and determine who has the better argument." [Citation.]' " (*Sierra Club*, *supra*, 163 Cal.App.4th at p. 531.)

**B.** *The EIR's Hydrology Analysis is Reasonable and the Hydrology Conclusions Are Supported by Substantial Evidence*

1. *Additional Facts Related to the Hydrology Analysis*

*a. Site Design Before, During, and After Construction*

"The project site consists of open undeveloped grassland with rolling terrain and the topography forms a valley in the center of the proposed development boundary, with a natural drainage outfall to the northwest," where the property abuts Eckerman Road. "The northwesternmost portion of the project site and the parcels adjacent to the project site and along Eckerman Road experience localized flooding during storm events."

7

Undeveloped, stormwater runoff from the project site flows into an "outfall [pipe] at the northern boundary of the project site. This pipe directs flows under the adjacent property and into a manmade ditch along the eastern side of Eckerman Road. The flows travel north in the ditch along Eckerman Road until another pipe that directs the flows under Eckerman Road and into another drainage ditch along the western side of Eckerman Road . . . . From there, drainage flows run across the property located at the southwest corner of Eckerman Road and Annabelle Avenue. There are two minor tributary drainage sheds where runoff flows from adjacent parcels to the north and south of the project area onto the site." Though construction of the project would involve some grading and excavation of the land, "the general slope and landform of the site would be similar to that under existing conditions and the project would retain the existing drainage patterns so that runoff would enter and exit the site at the same location."

In addition to developing drainage systems for the benefit of the new units on the project site, one of the stated objectives of the project is to "[i]mprove an existing, localized flooding problem in the Eckerman Road area with infrastructure improvements/storm drainage improvements." As described in the EIR, the project plans call for low impact development (LID) best management practice measures (BMP) including disconnected roof drains, "two above-ground open space/drainage swales [,]. . . and a landscaped detention basin" with a weir "in the northwest corner of the project site. The drainage swales would accommodate stormwater flows entering the project site at the northern and southern project boundaries. The swales would be vegetated and designed to provide pre-treatment before the water flows to the detention basin for detention and sediment settling. From the detention basin, stormwater would flow out" through a 24-inch outfall pipe "to the existing drainage headwall site along the northern boundary of the project site." According to the EIR, "the proposed drainage system also includes an additional BMP that is not considered an LID. This additional BMP is a *permanent* underground water quality treatment vault, *such as* a Continuous Deflection

8

System (CDS) unit, which is proposed to be located in the northwestern portion of the site. . . . The water quality treatment vault would separate and trap debris, sediment, and oil and grease from stormwater runoff before it is discharged into the receiving system. This water quality treatment vault would be the main form of runoff treatment and is anticipated to capture a very wide range of organic and inorganic solids and pollutants that typically result in large volumes of captured solids each year, such as: total suspended solids (TSS), oil and greases, trash, and other debris (including floatables, neutrally buoyant, and negatively buoyant debris). The LID BMPs such as the grass lined swales and vegetated detention basin provide additional levels of runoff water quality treatment."

> b. *A Drainage Study Found the Proposed Design Would Reduce Flooding and Exceed County Water Quality Standards*

In May 2015, prior to the release of the draft EIR, Wood Rodgers, an engineering consulting firm, prepared a preliminary drainage study to "evaluate and confirm sizing of on-site drainage facilities" that would support the project. In so doing, Wood Rodgers calculated the approximate level of impervious surfaces for the various forms of lot usage in the proposed project. It developed these percentages based on "actual post project build out conditions witnessed on other projects in the surrounding greater Placer County area," and considered the "1.8 acres of park, landscape buffer, and open space" along with roadways and residential lots. For lots Wood Rodgers labeled as "low density residential" it estimated the impervious surface percentage would be approximately 50 percent. For lots it deemed low density residential on a large lot, it estimated impervious surfaces at 30 percent.

The study also considered the various sizes of pipes the system would use to drain water through and from the site; the impact of a CDS system on water quality; soil conditions; Placer County requirements for representing storm rainfall; and various

9

formulas, models, and computer software programs that help model existing and proposed drainage routing through the site that can be used to make determinations about "pipe sizing, volume detention, and outlet sizing" as well as "treatment flow rates" in the proposed CDS system. Local design standards in place at the time of the study were looked at in determining the impact of the project's drainage system design features and sizing.

Based on preliminary designs, the drainage study determined flows from the existing site would be reduced by 0.5, 6.7, 5.7, and 9.1 cubic feet per second during 2-, 10-, 25-, and 100-year storm events, respectively. With respect to water quality, the hydrology study indicated the CDS unit would be designed "for the entire site['s] untreated flows" and the swales would provide "another level of treatment that exceeds County requirements" and are "technically unnecessary."

### c. EIR Findings and Mitigation Measures

The EIR considered the Wood Rodgers preliminary hydrology report and other sources when making its significance assessment which was "developed based on project-specific construction and operational features." Though appellants do not specifically identify which hydrology finding they find fault in, they appear to take issue with findings made and mitigation measures proposed with respect to surface water quality and runoff quantity during project operation--i.e., after project construction is complete. The EIR analyzes water quality and runoff quantity under impacts numbered 3.7-1 and 3.7-4 respectively.

With respect to water quality during operation, the EIR states: "In addition, surface water runoff from the residential, park, and open space uses could result in pollutants conveyed in surface water flows. The proposed LID BMPs as well as the water quality treatment vault would reduce surface water pollution exiting the project site. Therefore, implementation of the proposed project would result in less than significant long-term water quality impacts."

10

"Although [the EIR finds that] water quality impacts during long-term operational activities would be less than significant with the implementation of the proposed project including the water quality BMPs," the EIR includes mitigations measures "to further reduce less than significant water quality impacts during operational activities." Those measures include, but are not limited to, a requirement that all BMPs for the project be designed "in accordance with the West Placer Stormwater Quality Design Manual or other County approved methodology."

Relying on the preliminary hydrology study with respect to surface water flows, once the project is constructed and an operational residential community, the EIR concludes, "the proposed drainage system would be adequate, and no downstream flooding would occur as a result of project implementation. The existing localized flooding that occurs along Eckerman Road would not be exacerbated with the implementation of the proposed project. The project could reduce localized flooding. As the proposed drainage system would detain flows onsite and meter the release of water offsite, and peak discharge from the site would be less under proposed conditions, impacts would be less than significant." Despite this conclusion, the EIR includes mitigation measures to "further reduce the project's less than significant impact during operational activities." The additional mitigation measures involve a one-time drainage improvement and flood control fee of $143 per residence and further annual fees of $20 per residence.

### d. Approval of the West Placer Storm Water Quality Design Manual

On June 21, 2016, days before the Final EIR was released, the Board of Supervisors approved the West Placer Storm Water Quality Design Manual. "The post-construction storm water control requirements described" in the manual "apply to new development and redevelopment projects approved after July 1, 2015." (See West Placer Storm Water Quality Design Manual at p. 2-1 (Water Quality Manual).)

The manual "presents LID design standards to reduce runoff, treat storm water, and provide baseline hydromodification management." (Water Quality Manual at p. 1-3.) The manual serves as "a regulatory compliance tool that addresses the requirements of" various local hydrology control requirements. (Water Quality Manual at p. 1-3.) The manual calls on new project applicants to create and provide a template for a Storm Water Quality Plan (SWQP). (Water Quality Manual at p. 1-3.) "The SWQP documents a project's compliance with the Phase II MS4 Permit and provides a standardized format for complete and accurate analyses which will result in more efficient design, review, and project approval." (Water Quality Manual at p. 1-3.) The manual also highlights the need to implement stormwater treatment and hydro-modification measures that use bioretention based facilities as part of a system to remove water pollutants and reduce water volume. (Water Quality Manual at p. 4-3.)

> e. *Comments Received after Publication of the EIR and Updated*
> *Hydrology Analysis Using the SWQP*

On August 23, 2016, two days before the Planning Commission met to formulate recommendations to the Board of Supervisors regarding the project, appellants sent an analysis prepared by Edward Ballman of Balance Hydrology Inc. to the Planning Commission. Ballman raised two arguments that appellants raise here: (1) a "CDS mechanical separator system . . . is clearly not a bioretention system" as required by certain regulatory requirements; and (2) the diagrams in the hydrology study do not "include a depiction of the anticipated post-project impervious cover (building footprints, driveways, etc.) that would allow for confirmation that the assumed 50% impervious cover value is indeed appropriate. Recent development plans I have reviewed of like density often have impervious cover approaching 60% or more."

Similarly, in late September and early October 2016, Sharon Musgrove, a former member of the Planning Commission and a former senior resource analyst for the California State Department of Water Resources communicated with the County, and

12

expressed concerns regarding the hydrology analysis contained in the EIR. Musgrove noted that the proportion of impervious surfaces identified in an appendix of the initial hydrology study never rise over 50 percent, and she postulated that these figures do not consider impervious surfaces due to things like sidewalks, roads, and swimming pools. She believed the 50 percent figure cannot be correct. Musgrove also argued that the proposed CDS unit would not be a sufficient means of treating water for pollutants. In response to Musgrove's concerns, the County indicated that "with the adoption of the" Water Quality Manual the project will no longer include a CDS unit, but instead "a bioretention/infiltration basin . . . is now proposed." The County also indicated a final hydrology study would "reflect a value of 65%" for the lots characterized as low density residential. Many of Musgrove's stated concerns stemmed from requirements in the Water Quality Manual and her belief that the applicant never completed a SWQP.

However, in roughly the same time period that the County received Ballman's letter and engaged in communications with Musgrove--in the fall of 2016--the project applicant prepared and submitted a SWQP using the form linked to in the Water Quality Manual. The SWQP identified a bioretention basin as the means for filtering out likely pollutants. Additionally, according to County staff, the SWQP calculated impervious drainage levels assuming lots Wood Rodgers labeled low density residential had impervious surface areas of 65 percent. The SWQP concluded that water quality volumes and water quality flows would be managed onsite. It also concluded post-construction total peak runoff volumes would be less than or equal to pre-construction total peak runoff. The County provided Musgrove with a copy of the SWQP on October 5, 2016, four days before the Board of Supervisors met and approved the project and the EIR.

2. *The EIR's Hydrology Conclusions Are Supported by Substantial Evidence*

Appellants raise various arguments as to why they believe the EIR's conclusions regarding the water pollution or runoff quantity generated by the project were

13

unsupported. Three are at the crux of appellants' position. We address each of those arguments, then address the arguments appellants' make to buttress their position on these three arguments.

### a. Impervious Surface Issue

Citing the Ballman and Musgrove letters, appellants argue that the preliminary hydrology study, and therefore the EIR relies on faulty assumptions regarding impervious surfaces of the property. Appellants quote Ballman's letter for the proposition that "[r]ecent development plans . . . of like density often have impervious cover approaching 60% or more." They cite Musgrove's letter in support of their argument that the "EIR and Study omit[] key data regarding pervious and impervious runoff areas" without elaborating on the specific nature of the missing data and how it might have altered the results. They also refer to the Musgrove letter to allege fault with the Hydrology Study because it labels the residential lots as "low density" instead of "medium density."

As a preliminary matter, in advancing this argument, appellants are asking the court to replace the assessment of one possible expert with that of another. But "a difference of opinion among experts . . . does not provide grounds for rejecting [an] EIR." (*Fort Mojave Indian Tribe v. Dept. of Health Services* (1995) 38 Cal.App.4th 1574, 1600.) Indeed, the court, cannot select "among conflicting expert opinion and substitute[] its own judgment for that of the County." (*National Parks & Conservation Assn. v. County of Riverside* (1999) 71 Cal.App.4th 1341, 1365.)

Moreover, appellants fail to demonstrate why the County ought not have accepted Wood Rodgers's statements that in estimating impervious surfaces levels they looked at "actual post project build out conditions witnessed on other projects in the surrounding greater Placer County area," and considered the "1.8 acres of park, landscape buffer, and open space" along with lots for residences and roadways. As was pointed out by ESA, an environmental consulting firm that provided the County with a response to the Ballman letter, "[a] 50% impervious coverage factor for the proposed project is reasonable for the

14

proposed lot sizes and was reviewed by County staff.  Assuming 4,000 square feet of impervious surfaces per lot for each of the 56 proposed lots, approximately 48% of the site would be developed with impervious surfaces."  In essence, the record demonstrates that in relying on the preliminary study, the County acted reasonably and in good faith, and that study provided substantial evidence to support the EIR's significance findings.

Appellants attempt to minimize the import of the ESA letter by characterizing it as "speculation or unsubstantiated opinion" that cannot meet the substantial evidence standards of CEQA "especially in light of Mr. Ballard's [*sic*] comments."  This argument (1) is based on appellants' position that we must accept Ballman's estimations as superior to Wood Rodgers's or ESA's, though the County was not bound to rely on the word of the expert of appellants' choosing; and (2) assumes a difference of expert opinion means one of those opinions cannot serve as "substantial evidence."  But section 21080, subdivision (e), indicates substantial evidence includes, "fact, a reasonable assumption predicated upon fact, or expert opinion supported by fact."  The ESA letter demonstrates that the 50 percent impervious coverage factor applied to lots labeled "low density" in the preliminary hydrology study was both a reasonable assumption predicated upon a fact and an expert opinion supported by a fact.

Perhaps most importantly, to the extent appellants' argument hinges on their position that the preliminary hydrology study and EIR failed to take into account proper data variables, as evidenced by the fact that the applicant did not provide all the calculations to be included in a SWQP, this purported defect was cured before the County approved the project because the applicant did submit a SWQP.  The applicant used a SWQP template recommended by the Water Quality Manual and, in refining its assessment, assumed the lots it labeled "low density residential" were covered by 65 percent impervious surfaces.  Even with the increased estimate in impervious surface area, the SWQP predicts post-construction total peak runoff volumes will be less than or equal to pre-construction total peak runoff.  Contrary to appellants' assertion, this

15

increase to 65 percent does not indicate that the County "essentially acknowledges the flaws" in the preliminary study after hearing from Ballman and Musgrove. Rather, this change simply reflects that with additional time and information, and a new calculation framework, the applicant opted to use a larger factor in its analysis.

In short, the County did not err in allowing the preliminary study to serve as a basis to reach its hydrology conclusions regarding surface water quality and runoff quantity. Furthermore, a refined study using variables that more closely match the variables appellants argue should have applied was conducted before the EIR was approved and supports the EIR's conclusions.

Appellants try to minimize the value of the SWQP by indicating the study was never given to the public and the record does not indicate it was provided to the decision makers. This is effectively an argument that boils down to appellants taking the position that the EIR is faulty because it was not amended and recirculated once the SWQP was prepared. But that is not how CEQA works. "The CEQA reporting process is not designed to freeze the ultimate proposal in the precise mold of the initial project; indeed, new and unforeseen insights may emerge during investigation, evoking revision of the original proposal." (*County of Inyo v. City of Los Angeles* (1977) 71 Cal.App.3d 185, 199.) Consistent with this, CEQA guidelines only require an agency to recirculate an EIR when changes to the project will cause or new information reveals an adverse impact on the environment. CEQA Guidelines section 15088.5 states:

"A lead agency is required to recirculate an EIR when significant new information is added to the EIR after public notice is given of the availability of the draft EIR for public review under Section 15087 but before certification. As used in this section, the term 'information' can include changes in the project or environmental setting as well as additional data or other information. New information added to an EIR is not 'significant' unless the EIR is changed in a way that deprives the public of a meaningful opportunity to comment upon a substantial adverse environmental effect of the project or

16

a feasible way to mitigate or avoid such an effect (including a feasible project alternative) that the project's proponents have declined to implement."

Here, the refinement in the calculations regarding water quality and surface runoff amounts as contained in the SWQP do not reveal a substantial adverse environmental effect on the project. Therefore, the updated analysis does not represent a "significant" change to the EIR under CEQA guidelines. Because this change was not significant, the County was not obligated to recirculate the EIR or the SWQP.

### b. CDS Vault Issue

Appellants argue the EIR is deficient because the proposed CDS vault is not compliant with local water treatment standards. However, after the publication of the Water Quality Manual, the project switched from using a CDS vault for pollution control measures to using a bioretention basin. Using the Water Quality Manual-proposed template, the SWQP concludes that water quality volumes and water quality flows would be managed onsite. Appellants' argument regarding the CDS vault is moot.

Like with the revised analysis contained in the SWQP, the County was not obligated to redraft and recirculate the EIR when it switched the pollution-control measure from a CDS vault to a bioretention system, because the change did not have a "substantial adverse environmental effect of the project." (CEQA Guidelines, § 15088.5.)

### c. Easement Issue

Appellants argue the EIR's conclusion that the project will not result in significant impacts to the volume of surface water runoff is "dependent upon upsizing the culvert on Eckerman Road which requires approval of the landowners on Eckerman Road" and the County is unlikely to obtain that approval. They suggest the EIR is flawed because it "does not address the impacts of stormwater run-off if the Real Parties do not receive approval to modify the culvert on Eckerman Road." This argument fails because the record does not demonstrate the culvert must be expanded.

17

To support their position, appellants point to two documents. One document is a June 2015 memorandum from the County Engineering and Surveying Division to the Planning Services Division, in which the author indicates that tentative maps for the project should:

"Show the extent of offsite improvements, including the widening for Eckerman Road, drainage, sewer, water and any other offsite improvements to demonstrate that these improvements can be built within easements. Clearly show where offsite easements must be acquired by the developer. Please provide a Preliminary Title Report showing rights over the existing easements in Eckerman Road. Improvements to Eckerman are still required (see [below]). A private road easement appurtenant to the subdivided property to construct . . . necessary drainage . . . over Eckerman out to Annabelle will be required."

The cross-referenced language in the memorandum provides:

"Offsite right of entry for construction, as well as drainage and maintenance easements shall be required where necessary and the applicant should contact adjacent property owners about the likelihood of obtaining these easements. Alternatively, the walls and drainage facilities could be moved onsite, eliminating the need for right of entries or offsite easements."

While the paragraph about tentative maps that appellants choose to quote uses language that suggests an easement will be required, the paragraph regarding "possible grading impacts"--i.e., the paragraph more concerned with showing actual possible physical conditions as opposed to the paragraph concerned about capturing those conditions on a map--is less definitive as to whether a drainage easement will be required. It states, "maintenance easements shall be required *where necessary*," (italics added) but concedes there is at least one possible drainage plan that would "eliminat[e] the need for . . . offsite easements."

18

The second document appellants cite is an e-mail in which a County employee responds to the memorandum's comments by indicating: "we will need to discuss the specifics, because they have no rights to [upsize] the culvert on Eckerman, and due to neighbor sentiments, it's unlikely they will get any agreement to do so." In the e-mail exchange, one employee suggests it would not be practical to add a mitigation measure that requires upsizing the culvert "as needed" because the neighbors would not approve. This exchange does not indicate that a culvert expansion will actually be needed.

Tellingly, in making the easement argument, appellants do not point to any language in the project design, the preliminary hydrology study, or the SWQP to suggest that the project's hydrology plans will, in fact, require an upsizing of the culvert on Eckerman Road. Indeed, it is possible no improvements to Eckerman Road will be needed because the project is designed such that "total post-project peak runoff" is "equal to or less that the total pre-project peak runoff[.]" In other words, the SWQP shows that the project will not increase runoff to Eckerman Road during the storm events that caused pre-project flooding, and there will be no need to expand the culvert to manage water flow during storm events.

### d. Miscellaneous Other Arguments

In an effort to advance their position that the EIR's hydrology findings are not supported or based on sufficient information, appellants raise various other arguments, none of which we find persuasive.

First, appellants argue that the EIR's hydrology impact findings cannot stand because, "[t]he generic description of the proposed drainage system does not definitively demonstrate that these facilities will be sufficient to avoid increases in peak flow." This misstates both the requirements for an EIR and the standard of review applied by the court. CEQA does not require an EIR or its supporting documentation to provide highly detailed information and specifications regarding proposed plans that will have an environmental impact. Instead, it requires, "[a] *general* description of the project's

technical, economic, and environmental characteristics, considering the principal engineering proposals if any and supporting public service facilities." (CEQA Guidelines, § 15124, italics added.) As the Fifth District Court of Appeal found in *Dry Creek Citizens Coalition v. County of Tulare* (1999) 70 Cal.App.4th 20, 28, "[t]he 'general description' requirement for the technical attributes of a project is consistent with other CEQA mandates to make the EIR a user-friendly document. For example, [CEQA] Guidelines section 15140 states that EIR's must be written in plain language so that decisionmakers and the public can rapidly understand them." A general description "also fosters the principle that EIR's should be prepared early enough in the planning stages of a project to enable environmental concerns to influence the project's design. ([CEQA] Guidelines, § 15004[)]" because it "can be provided earlier in the process than a detailed engineering plan and is more amenable to modification to reflect environmental concerns." (*Ibid.*)

The drainage plan description provided in the EIR satisfies this requirement. As for appellants' statement that the description does not "definitively demonstrate" that the proposed facilities are sufficient, we do not review administrative CEQA findings for evidence that the conclusions are definitively demonstrated. We review them to see if they are supported by substantial evidence. Substantial evidence supports the hydrology findings. (*Laurel Heights*, *supra*, 47 Cal.3d at p. 392.)

Next, appellants argue that the mitigation measures adopted to further minimize potential negative water quality impacts are insufficient because the County does "not require compliance with the West Placer Stormwater Quality Design Manual." This is a misleading argument and lacks merit. Mitigation measure 3.7-1(d) states that "BMPs shall be designed in accordance with the West Placer Stormwater Quality Design Manual or other County approved methodology." Though this language may not "require" compliance with the Water Quality Manual, it allows for some flexibility as to which standards to use in evaluating BPM designs both at the outset and going forward. That

20

flexibility can serve to allow the project to later adopt more stringent standards and methods than those provided for in the Water Quality Manual. This flexible language is not a basis for finding fault with the EIR.

Additionally, appellants argue the EIR's conclusion regarding surface water drainage is unsupported because the proposed drainage facilities are not mandatory design features or part of binding mitigation measures for the project. They imply that because mitigation measures require the developer to submit final drainage plans for dealing with runoff *during* construction a requirement to submit drainage plans for the operational project ought to have been identified as a mitigation measure. This argument lacks merit. The drainage system is an integral part of the project, which has resulted in (1) the creation of subdivision maps that designate specific plots of land that are dedicated to drainage needs; (2) a CEQA Findings of Fact that identifies the "installation of a water quality detention basin" in the project description; and (3) a Findings of Fact that identifies "[i]mprove an existing, localized flooding problem in the Eckerman Road area with infrastructure improvements/storm drainage improvements" as one of the project objectives. Because the drainage facilities are an integral part of the project, the EIR was allowed to evaluate the project and develop mitigation measures assuming those drainage improvements will be implemented. (See *Village Laguna of Laguna Beach, Inc. v. Board of Supervisors* (1982) 134 Cal.App.3d 1022, 1029-1030.) In contrast mitigation measures to deal with surface runoff during construction were appropriate because, to state the obvious, the permanent drainage facilities that are being added as part of the construction will not be available until that construction has begun, and interim measures may be needed to prevent environmental harm during construction.

Finally, appellants argue that the project's "failure to demonstrate the proposed project design will maintain surface water runoff at or below existing flows violates [the] Placer County Code section 16.08.040(D)(2)" renders the EIR deficient.

21

County Code section 16.08.040(D)(2) states that design improvements for a project, "shall be such that water occurring within the subdivision will be carried off such subdivision without injury to any improvements, residential sites, or residences to be installed on sites within the subdivision, or to adjoining areas or cause erosion of siltation that would be detrimental to the environment of the area." To begin with, much like appellants' argument that the project description is too generic to demonstrably show the project will not have significant hydrology impacts, this position incorrectly suggests that the standard of proof we apply here is one of certainty. But that is not the standard. The standard is substantial evidence. Because substantial evidence supports the EIR's findings regarding surface water runoff, substantial evidence supports a conclusion that the project will not violate County Code section 16.08.040(D)(2).

C. *The Traffic Analysis and Findings Comply With CEQA*

Appellants argue that the EIR's conclusions related to the impact of the project on traffic flows around the project are not supported by substantial evidence and are based on incomplete analysis. We again disagree.

1. *Additional Facts Related to the Traffic Analysis*

a. *Roadways Surrounding the Project*

Though the project site is located within an unincorporated part of Placer County, "it is surrounded by lands and roadways that fall within the incorporated limits of the City of Roseville, including Sierra College Boulevard."

The main ingress and egress to the property would be through a single gated access driveway at the project midpoint along Sierra College Boulevard. Sierra College Boulevard is a four-lane divided arterial roadway with a 36-foot median. In the future, Sierra College Boulevard may be widened to six lanes, with the additional two lanes resulting from conversion of an outside portion of the median to travel lanes. The project proposes that vehicles traveling north on Sierra College Boulevard will be able to turn

22

left into the project site at the access point, but that vehicles exiting the project will only be able to turn right. The City of Roseville has jurisdiction over the portion of Sierra College Boulevard that is adjacent to the project site.

Annabelle Avenue is about a half mile long, and runs east from Annabelle Court to Sierra College Boulevard approximately 500 feet from the project site's northern edge. It is a two-lane residential street that is two-way stop controlled at its intersection with Sierra College Boulevard. That intersection is within the City of Roseville's jurisdiction.

Approximately 1,000 feet south from the project site, Sierra College Boulevard intersects with Old Auburn Road, a two-lane minor arterial that runs in a northeast-southwest direction. That intersection is within the City of Roseville's jurisdiction.

> b. *Data and Regulations Considered by Traffic Impact Study in Evaluating Traffic Volume*

In order to assist in the evaluation of traffic impacts to the surrounding area caused by the project both by itself in the present day and as part of cumulative impacts on traffic in the year 2035 (Cumulative Plus), Wood Rodgers performed a traffic impact study in which it analyzed existing and projected traffic volumes at three points on Sierra College Boulevard: at the two-way stop sign controlled intersection with Annabelle Avenue, at the project's proposed entrance point, and at the intersection with Old Auburn Road. As a starting point for making their calculations, Wood Rodgers conducted existing traffic counts during peak weekday a.m. and p.m. traffic hours--the highest consecutive hour of traffic between 7:00 a.m. and 9:00 a.m., and 4:00 p.m. and 6:00 p.m. respectively--at Sierra College Boulevard's intersections with Old Auburn Road and Annabelle Avenue.

Wood Rodgers then calculated the Level of Service (LOS) for each intersection. The LOS scale characterizes the amount of delay traffic flows are likely to experience at any given intersection, with LOS A rated intersections experiencing the least delay (less

23

than or equal to 10 seconds) and LOS F rated intersections experiencing the most delay (more than 80 seconds at signalized intersections and more than 50 seconds at two- or all-way stop sign controlled intersections).  At signalized intersections, like the one at Sierra College Boulevard and Old Auburn Boulevard, the LOS value reflects the average delay experienced by all traffic that goes through the intersection.  At two-way stop intersections, like the one at Sierra College Boulevard and Annabelle Avenue, the LOS value reflects the " 'worst case' movement" delays experienced at the intersection, e.g. at Annabelle Avenue the LOS calculation captured the delays "caused by vehicles on the Annabelle Avenue side-street approach experiencing long waiting times while attempting to find acceptable 'gaps' to turn left ('worst-case' movement) onto northbound Sierra College Boulevard."  The LOS for an intersection during a.m. and p.m. peak hours is expressed as LOS [a.m. value]/[p.m. value].  For example, an intersection with a peak a.m. LOS of C and peak p.m. LOS of D would be denoted as having a LOS C/D.

Due to the projects location and the jurisdiction of the roadways, Wood Rodgers and the EIR considered three sets of regulations and goals that relate to traffic:  The Placer County General Plan Transportation and Circulation Element (the Placer Circulation Element), the Granite Bay Community Plan Circulation Element (the Granite Bay Circulation Element), and The City of Roseville General Plan (2025) Circulation Element (the Roseville Circulation Element).  Notably, while the other local standards apply LOS standards to unsignalized intersections, the Roseville Circulation Element focuses on signalized intersections, and states that 70 percent or more of all signalized intersections should maintain a minimum LOS C standard during peak traffic hours.

Because the City of Roseville does not have policies regarding LOS levels at unsignalized intersections, to assist in evaluating the " 'significance' " of traffic delays at the unsignalized intersections--i.e. at Sierra College Boulevard's intersections with the project site and Annabelle Avenue--Wood Rodgers completed a traffic signal warrant analysis, based on criteria described in the January 21, 2010, supplement to the

24

*California Manual on Uniform Traffic Control Devices*.  "The term 'signal warrants' refers to the list of established criteria used by Caltrans and other public agencies to quantitatively justify or ascertain the need for installation of a traffic signal at an unsignalized intersection location."  Several factors interact in establishing signal warrant criteria.  "Based on [a] posted 45 mph speed limit on Sierra College Boulevard" Wood Rodgers "conservatively evaluated" the potential justification for a signal warrant at the subject intersections using a "Peak-Hour-Volume-based Warrant 3 (Rural Areas)" signal warrant analysis as a "representative type of warrant analysis."

Using methods documented in the Transportation Research Board's *Highway Capacity Manual, Fifth Edition* (2010) and specialized software, and assuming the project would generate rates of traffic described in the *Institute of Transportation Engineers Trip Generation Manual, 9th Edition* Wood Rodgers made the following findings with respect to the three intersections:

- Under current conditions, the Sierra College and Annabelle Avenue intersection operates at an a.m. peak delay of 31.3 seconds, and a p.m. peak delay of 56.8 seconds, giving it a LOS D/F.  The intersection does not meet the criteria for a signal warrant.  Wood Rodgers estimated that adding projected traffic to existing conditions would change it so the intersection would operate at an a.m. peak delay of 31.5 seconds and a p.m. peak delay of 59.1 seconds, giving it a LOS D/F, reflecting an increased delay in the a.m. peak hour of 0.2 seconds and in the p.m. peak delay of 2.3 seconds and no change to the LOS.  The intersection would still not meet the criteria for a signal warrant.  Assuming the project is not built, Wood Rodgers concluded that by 2035, the intersection would operate at an a.m. peak delay of over 80 seconds and a p.m. peak delay of over 80 seconds, giving it a LOS F/F.  The intersection would still not meet the criteria for a signal warrant.  Assuming the project is built, Wood Rodgers concluded that by 2035, the intersection would operate at an a.m. peak delay of over 80 seconds and a p.m.

25

peak delay of over 80 seconds, giving it a LOS F/F, representing no LOS change over cumulative changes without the project.  The intersection would still not meet the criteria for a signal warrant.

- Under current conditions, the Sierra College and Old Auburn Road intersection operates at an a.m. peak delay of 28.8 seconds, and a p.m. peak delay of 23.4 seconds, giving it a LOS C/C.  The intersection already has a signal; so, the warrant analysis was not applied.  Wood Rodgers estimated that adding projected traffic to existing conditions would change it so the intersection would operate at an a.m. peak delay of 29.8 seconds and a p.m. peak delay of 23.9 seconds, giving it a LOS C/C, reflecting an increased delay in the a.m. peak hour of 1 second and in the p.m. peak delay of 0.5 seconds and no change to the LOS.  Assuming the project is not built, Wood Rodgers concluded that by 2035, the intersection would operate at an a.m. peak delay of 60.5 seconds and a p.m. peak delay of 44.2 seconds, giving it a LOS E/D.  Assuming the project is built, Wood Rodgers concluded that by 2035, the intersection would operate at an a.m. peak delay of 65.2 seconds and a p.m. peak delay of 49.4 seconds, giving it a LOS E/D, representing an increase of 4.7 seconds over the a.m. peak and 5.2 seconds over the p.m. peak, with no LOS change over cumulative changes without the project.

- The intersection of Sierra College with the project site driveway is not yet operational; so, it does not have current LOS values.  Wood Rodgers estimated that under current conditions, the new driveway intersection would operate at an a.m. peak delay of 15.3 seconds and a p.m. peak delay of 19.2 seconds, giving it a LOS C/C.  The intersection would not qualify for a signal warrant.  Assuming the project is built, with other cumulative traffic changes, Wood Rogers estimated the project would have a 49.2 peak a.m. hour delay and an over 80 second peak p.m. delay, for a LOS E/F by the year 2035.  Wood Rodgers predicted the intersection will still not qualify for a signal warrant in 2035.

26

c.      *Wood Rodgers's Evaluation of the Data Regarding Traffic Volume*

Wood Rodgers examined its data and concluded the project would have a " 'significant' " impact on the following existing Sierra College intersections in the indicated time frames:  at Annabelle Avenue under both current conditions and cumulative conditions for 2035, and at Old Auburn Road under cumulative conditions for 2035.  In each case, Wood Rodgers reasoned the impact was significant because, though the project-generated traffic would not change the LOS designation of the intersection, (1) the project would increase average intersection delay; (2) the intersection is currently or would in 2035 operate at a standard below LOS C without the additional project-generated traffic; and (3) "[b]ased on City of Roseville policy, the minimum acceptable standard for this intersection is LOS 'C.' "  In short, in instances in which Wood Rodgers determined an intersection does now or will in 2035 operate below LOS C, Wood Rogers treated any increase in calculated delays as significant.  Wood Rodgers looked at measures to alter the subject intersections that could feasibly reduce traffic delays, but noted there are not currently identified funding programs or timetables in the City's Capital Improvement Program with which to implement those changes.  Wood Rodgers thus concluded that, after looking at the potential mitigation measures, the project impacts in the above scenarios would be " 'significant and unavoidable.' "

With respect to the proposed new intersection at the entry to the project site, Wood Rodgers concluded that under current conditions, and assuming the project proceeded with the proposed no-left-turn egress, the intersection would operate at a LOS C/C, and, therefore the impact would be " 'less than significant.' "  Under all scenarios, Wood Rodgers concluded that in 2035, the driveway's LOS would be LOS D/D "or worse" and that this impact was " 'significant and unavoidable.' "

27

#### d. *EIR Analysis of the Data Regarding Traffic Volume*

The EIR identified specific measurements it used to ascertain the impact project-generated traffic would have on the traffic near the project area. In light of the City of Roseville's policy that establishes a goal of 70 percent or more of the City's signalized intersections operating at LOS C or better, the EIR states that the project's impact on traffic at signalized intersections would be significant if: (1) it caused the downgrading of the LOS at a signalized intersection operating at or above LOS C to below LOS C, or the downgrading of a signalized intersection operating at below LOS C to an even lower designation (e.g., if a LOS D was downgraded to a LOS E); (2) the "downgrade in LOS designations at City signalized intersections, directly attributable to delay from the proposed project, would decrease the percentage of City signalized intersections performing at or above LOS 'C' from 70 percent or greater to less than 70 percent" or; (3) "[i]f, under existing or cumulative . . . conditions" without project-generated traffic, "less than 70 percent of City Signalized intersections are performing at LOS C or better, and the addition of project traffic would downgrade the LOS designations of additional intersections from LOS C or better to below LOS C."

Because the City of Roseville "does not apply LOS policies to unsignalized intersections," the EIR indicates that project-generated traffic would be deemed to have a significant impact on traffic at an unsignalized intersection if, based on the warrant criteria applied by Wood Rodgers, "the addition of the proposed project to existing conditions caused the satisfaction of a traffic signal warrant."

Using the above framework, the EIR concludes that because, under existing conditions, the signalized intersection at Sierra College Boulevard and Old Auburn Road would continue to operate at a LOS C/C, the impact of the project on existing conditions at the intersection would be less than significant. Similarly, because the LOS for the intersection in 2035 was projected to be LOS E/D with or without the additional traffic

28

generated by the project site, the EIR concludes the project's impact on the intersection would be "less than cumulatively considerable."

As for the unsignalized intersections, though the EIR discusses the LOS projections at the two unsignalized intersections--the one at Annabelle Avenue and the one at the driveway for the project site, it applies the signal warrant analysis to determine significance of traffic impacts at both intersections. Consistent with its stated criteria that "the proposed project would be determined to have a significant impact at unsignalized intersections if the addition of the proposed project to existing conditions caused the satisfaction of a traffic signal warrant in the absence of a specific policy for LOS" the EIR determined that the project would have "less than significant" impact at the two intersections under existing conditions, and a "less than cumulatively considerable" impact in 2035.

### e. Weaving Analysis

In September 2015, Wood Rodgers provided a supplement to the traffic study in which it provided the results of an analysis it had prepared "of the weaving movement . . . that would result from project vehicles turning right onto southbound Sierra College Boulevard and merging left to the left-turn pocket lane at Old Auburn Road intersection . . . in order to make a U-turn onto . . . Sierra College Boulevard." "Due to the relatively low volumes of project traffic merging into the left-turn lane," Wood Rogers concluded the traffic movement would "not have any significant impacts on traffic operations" on that segment of Sierra College Boulevard under existing or cumulative plus conditions. Based on the Wood Rodgers analysis, the EIR finds that "the distance between the project driveway and old Auburn Road would be sufficient to allow safe weaving movements. Further, the impact to the segment of Sierra College Boulevard from weaving movement originating from the project site would not alter the existing LOS designation." On this basis, the EIR concludes the "potential impacts to the roadway

29

segment of Sierra College Boulevard to the south of the project site from weaving movements would be considered less than significant."

Wood Rodgers did not perform an additional weaving analysis for other segments of traffic flow. However, in response to comments regarding safety concerns stemming from additional traffic weaving generated by the project, the Final EIR indicates, "[t]he distance between Annabelle Avenue and the proposed project driveway would be approximately 750 feet, which represents ample distance for vehicles turning from Annabelle Avenue to southbound Sierra College Boulevard to accelerate and not conflict with southbound Sierra College Boulevard traffic that would turn westbound into the project site. Typically, vehicles would not decelerate 750 feet prior to making a turn. Therefore, there would be adequate distance to allow the acceleration of vehicles turning onto southbound Sierra College Boulevard and the deceleration of vehicles turning right into the project site without creating a vehicular conflict. The proposed deceleration lane along southbound Sierra College Boulevard approaching the project driveway would allow vehicles room to adjust speed for turning, providing increased safety over a roadway configuration without a deceleration lane."

*2. The County Did Not Abuse Its Discretion in Making Traffic Significance Findings*

Based on the above set of facts, substantial evidence supports the EIR's conclusion that the traffic impacts by the project at the three studied intersections would be less than significant under present conditions and less than cumulatively considerable by 2035. Substantial evidence also supports the conclusion that the potential impacts to the roadway segment of Sierra College Boulevard to the south of the project site from weaving movements would be considered less than significant. The analysis took into consideration expert calculation of traffic flows in addition to guidelines and standards applicable to Sierra College Boulevard.

30

Appellants challenge these conclusions on four grounds. First, appellants contend there is a "major and unexplained" conflict between the "data and conclusions" in the traffic study and in the EIR, given that the traffic study concluded traffic impacts at some of the intersections would be significant and the EIR did not. Appellants argue this conflict is exacerbated by the fact that the expert applied a "rural" framework to the signal warrant analysis when the County maintains the project site is not rural. Second, they argue the EIR analysis is faulty because it does not include a weaving analysis for southbound traffic between Annabelle Avenue and the entrance to the project site. Third, they argue the EIR is lacking because it fails to account for changes in elevation along Sierra College Boulevard that "make it difficult to see vehicles entering and exiting the roadway." Fourth, they argue that the EIR fails to consider how the proposed expansion of Sierra College Boulevard will impact improvements to the roadway that are designed to mitigate potential traffic impacts. None of these arguments succeeds.

As to the first argument, appellants mischaracterize the conflict. While the traffic study and EIR may reach different qualitative conclusions about the import of the data, they do not conflict in terms of what that data says about quantitative traffic levels. To the extent they interpret the import of the data differently, that difference is the result of a difference in the selection and application of local guidelines governing traffic. "CEQA grants agencies discretion to develop their own thresholds of significance." (*Save Cuyama Valley v. County of Santa Barbara*, (2013) 213 Cal.App.4th 1059, 1068; see also CEQA Guidelines, § 15064, subd. (b)(1) ["The determination of whether a project may have a significant effect on the environment calls for careful judgment on the part of the public agency involved, based to the extent possible on scientific and factual data"].) "There is no 'gold standard' for determining whether a given impact may be significant." (*Protect the Historic Amador Waterways v. Amador Water Agency* (2004) 116 Cal.App.4th 1099, 1107.) This is so because, "[a]n ironclad definition of significant effect is not always possible because the significance of an activity may vary with the

31

setting." (Guidelines, § 15064, subd. (b)(1).) The import of a lead agency's role in making qualitative determinations regarding the significance of quantitative data is further reflected by the requirement that the "decisionmaking; body of a public agency shall not delegate . . . [¶] [r]eviewing and considering a final EIR." (CEQA Guidelines, § 15025, subd. (b)(1).) Here, the County properly exercised its authority to determine that a warrant analysis should be applied to the unsignalized intersections rather than a LOS analysis, because the intersections are in a jurisdiction where LOS standards do not control unsignalized intersections. This particular difference between the EIR and traffic study conclusions exemplifies why lead agencies need to make their own final significance determinations: Wood Rogers's interpretation of the Roseville policy is an understandable misreading, but a misreading nonetheless. As indicated, the Roseville policy is that 70 percent of all *signalized* intersections must operate at a LOS C--the plain meaning of this policy is not all intersections need to operate at LOS C. This standard allows that even some signalized intersections will operate below LOS C, and unsignalized intersections are not evaluated using the LOS scale. Thus, when Wood Rodgers reasons that "[b]ased on City of Roseville LOS policy, the minimum acceptable standard for this [unsignalized] intersection is LOS 'C' " it misinterprets the local standard.

With an understanding that local policies using LOS values are applied by looking at signalized intersections, the EIR looks to whether the unsignalized intersections would become eligible for a signal, thereby bringing them into the pool of intersections to be counted when determining if 70 percent or more of signalized intersections operate at LOS C or below. When the data showed the change in traffic flows would not make the intersections eligible for a signal warrant, the EIR appropriately found the change in traffic volumes at the intersection would be less than significant based on the County's chosen significance threshold. As for appellants' argument that the signal warrant analysis is faulty because the expert applied a "rural" framework and this project is not

32

zoned rural, the appellants exaggerate the significance of the chosen framework. Wood Rodgers does not say the area is rural. Rather, based on a variety of considerations they selected and applied the framework as a "representative type of warrant analysis."

Appellants argue the EIR is deficient because it does not include a weaving analysis for traffic traveling southbound on Sierra College Boulevard from Annabelle Avenue to the project entry site, or account for changes in elevation along Sierra College Boulevard that might impact the ability to see vehicles entering and exiting the project site. ESA, an environmental consultant, responded to both of these concerns when appellants raised them with the County. As to the first topic, ESA notes "[a]ccording to the traffic consultants, weaving analysis for this roadway segment is not required because the distance . . . is approximately 770 feet. This is enough distance for vehicles turning right from Annabelle Avenue onto southbound Sierra College Boulevard to integrate with vehicles preparing to turn right into the project driveway. Additionally, the project will have a deceleration lane on southbound Sierra College Boulevard, allowing slowing and turning vehicles to segregate themselves from through traffic." As to the second issue ESA indicates, "[t]here is a 3% vertical slope on Sierra College Boulevard, and the roadway slopes downward north to south. The project does not propose to alter the vertical topography of the roadway and sight lines would be maintained. The project driveway would be approximately 1,200 feet downhill from the crest of Sierra College Boulevard. Vehicles traveling south on Sierra College would be visible both to drivers exiting the project site and turning right and to drivers turning left into the project site from northbound Sierra College Boulevard." These statements suggest the analysis appellants indicate is missing on both topics is missing because the issues appellants raise are really non-issues. Appellants argue that to the extent ESA's response regarding weaving relies on information it obtained from the expert, it "does not constitute substantial evidence as it is not from the traffic consultant and only purports to state what the traffic consultant stated about weaving."

33

But this misses the import of the explanation.  We are being asked to determine whether the EIR is deficient when it does not address every topic appellants raise in opposition to the project.  Here, we start with the standard that, "CEQA does not require a lead agency to conduct every test or perform all research, study, and experimentation recommended or demanded by commenters.  When responding to comments, lead agencies need only respond to significant environmental issues and do not need to provide all information requested by reviewers, as long as a good faith effort at full disclosure is made in the EIR." (CEQA Guidelines, § 15204, subd. (a).)  "A project opponent or reviewing court can always imagine some additional study or analysis that might provide helpful information.  It is not for them to design the EIR.  That further study . . . might be helpful does not make it necessary." (*Laurel Heights*, *supra*, 47 Cal.3d at p. 415.)  Here, the ESA response shows that the County acted in good faith and made a reasonable inquiry into possible traffic impacts.

Finally, appellants take issue with the fact that the EIR relies on the future expansion of Sierra College Boulevard in reaching its findings regarding cumulative impacts without assessing how "this future expansion will impact the mitigation measures proposed to address the Project's direct traffic impacts.  For instance, the Project includes" a deceleration lane and a left-turn ingress only lane at the entrance of Sierra College Boulevard.  Appellants state the expansion "will require additional land, either in the median or on the shoulders.  Yet the EIR Completely fails to assess whether these project-specific improvements can remain once the expansion is in place."  As the trial court indicated in rejecting this argument, ESA responded to this argument when the appellants raised it after the close of the EIR comment period by stating, "[t]he future roadway expansion will occur in the existing median and will accommodate one northbound lane, one southbound lane, and a turn lane into the project site.  No outside widening of Sierra College Boulevard would occur within the project vicinity; thus, project driveway acceleration/deceleration lanes would not change under cumulative

34

conditions."  ESA's representation is supported by the Tentative Subdivision Map.  In short, as has been pointed out to appellants repeatedly, the EIR did not consider what would happen if the City removes project improvements when it widens Sierra College Boulevard, because the City's plans do not include the removal of the deceleration or turn lanes.  There was no error.

*D.  The EIR Sufficiently Addresses Land Use Plans*

CEQA requires EIRs to address, "any inconsistencies between the proposed project and applicable general plans."  (CEQA Guidelines, § 15125, subd. (d).) Appellants argue that the EIR failed to comply with this guideline because it did not consider the project's inconsistency with policies numbered 1.A.3 and 4.E.7 of the Placer Countywide General Plan.  This argument fails, because, as discussed in more detail in section II.C. below, the project is not inconsistent with those two policies.

II

*The Project Does Not Violate State Planning and Zoning Laws and the Subdivision Map Act*

Appellants argue that the County violated California planning and zoning laws and the Subdivision Map Act and abused its discretion when it approved the project. Specifically, appellants argue the project conflicts with one policy contained in the *Granite Bay Community Plan*, the land use policy number 5 applicable to subdivisions (Land Use Policy 5), and two policies in the *Placer County Countywide General Plan*, policies 1.A.3 and 4.E.7.  We disagree.  While the approved project may not be consistent with Land Use Policy 5, that policy is not fundamental to the *Granite Bay Community Plan*.  The County's approval of the project is not inconsistent with either policy 1.A.3 or policy 4.E.7.

35

*A. Additional Facts Related to Land Use Policies*

"The *Placer County General Plan* consists of two types of documents: [the] *Countywide General Plan* (which consists of a policy document and land use diagram) and a set of more detailed community plans (including one 'area' plan) covering specific areas of the unincorporated county." "The *Countywide General Plan* provides an overall framework for development of the county and protection of its natural and cultural resources. The goals and policies contained in the *Countywide General Plan* are applicable throughout the county, except to the extent that County authority is preempted by cities within their corporate limits." Community plans, which are "adopted in the same manner as the *Countywide General Plan*, provide a more detailed focus on specific geographic areas within the unincorporated county. The goals and policies contained in the community plans supplement and elaborate upon, but do not supersede, the goals and policies of the *Countywide General Plan*." Given the location of the project site, it is covered by both the *Countywide General Plan* (*General Plan*) and the *Granite Bay Community Plan* (*Granite Bay Plan*).

In a section regarding land use policies, the *General Plan* states, "[t]he land use designations used in this *General Plan* are intended to generally portray overall land use patterns throughout the unincorporated areas of the county rather than precisely define the specific land uses appropriate on each parcel of land. The land use policies and standards of the *General Plan* are implemented on a day-to-day basis through zoning, which imposes specific development standards on any proposed land use." Similarly, and reflecting its role as a supplement to the *General Plan*, the *Granite Bay Plan* indicates, "[t]he County depends on the Community Plan to not only guide land use decision-making but to also provide flexibility that is essential for mature neighborhoods to adapt in the face of changing social, economic, physical and environmental considerations."

The EIR evaluated 17 goals and policies of the *General Plan* that it deemed were relevant, and determined that the project was consistent with each of them. This evaluation did not include a discussion regarding policies 1.A.3 and 4.E.7. Policy 1.A.3. supports Goal 1.A. regarding general land use in Placer County. Goal 1.A. is to "promote the wise, efficient, and environmentally-sensitive use of Placer County lands to meet the present and future needs of Placer County residents and businesses." Policy 1.A.3. states "[t]he County shall distinguish among urban/suburban and rural areas to identify where development will be accommodated and where public infrastructure and services will be provided. This pattern shall promote the maintenance of separate and distinct communities." Goal 4.E. is "[t]o manage rainwater and stormwater at the source in a sustainable manner that least inconveniences the public, reduces potential water-related damage, augments water supply, mitigates storm water pollution, and enhances the environment." Policy 4.E.7. states, "[t]he County shall prohibit the use of underground storm drain systems in rural and agricultural areas, unless no other feasible alternatives are available for conveyance of stormwater from new development or when necessary to mitigate flood hazards."

The EIR evaluated the project to determine if it was consistent with 20 of the goals and policies contained in the *Granite Bay Plan*. It determined the project was consistent with each identified policy except for Land Use Policy 5, which states in residential subdivisions:

> "Lots shall be adequate in size and shape to accommodate those primary and accessory uses which are in keeping with the particular residential characteristics of the specific location without:
>
> "a) Creating a feeling of overcrowding.
>
> "b) Creating measurable negative environmental impacts which cannot be adequately mitigated.
>
> "c) Creating the need for variances.'

37

The EIR noted that "the project seeks a Variance for maximum lot coverage on single-story lots of less than 8,000 square feet, the 14 deed restricted single-story units on the perimeter of the project have been proposed specifically to reduce any feeling of overcrowding that could be perceived by the adjacent properties."

B. *Standards for Evaluating Consistency with Community Plans*

Government Code section 65300 states that within each county its "planning agency shall prepare and [its] legislative body . . . shall adopt a comprehensive, long-term general plan for the physical development of the county . . . , and of any land outside its boundaries which in the planning agency's judgment bears relation to its planning." The plan "shall consist of a statement of development policies and shall include a diagram or diagrams and text setting forth objectives, principles, standards, and plan proposals. The plan shall include . . . [¶] [a] land use element that designates the proposed general distribution and general location and extent of the uses of the land." (Gov. Code, § 65302.) "The general plan has been aptly described as the 'constitution for all future developments' within the city or county. [Citations.] '[T]he propriety of virtually any local decision affecting land use and development depends upon consistency with the applicable general plan and its elements.' [Citations.]" (*Goleta*, *supra*, 52 Cal.3d at pp. 570-571; see also Gov. Code, § 66474, subd. (a) ["A legislative body of a city or county shall deny approval of a tentative map, or a parcel map for which a tentative map was not required, if it makes any of the following findings: (a) That the proposed map is not consistent with applicable general and specific plans"].)

Yet, "no project is entirely consistent with a general plan ' " '[b]ecause policies in a general plan reflect a range of competing interests.' " ' (*Friends of Lagoon Valley v. City of Vacaville* (2007) 154 Cal.App.4th 807, 816 [65 Cal. Rptr. 3d 251].) For this reason, '[s]tate law does not require perfect conformity between a proposed project and the applicable general plan.' (*Id.* at p. 817[.])" (*Orange Citizens for Parks & Recreation*

*v. Superior Court* (2016) 2 Cal.5th 141, 157.) "A project is consistent with the general plan ' "if, considering all its aspects, it will further the objectives and policies of the general plan and not obstruct their attainment." ' [Citations] . . . To be consistent, a subdivision development must be 'compatible with' the objectives, policies, general land uses and programs specified in the general plan. [Citations.]" (*Families Unafraid to Uphold Rural etc. County v. Board of Supervisors* (1998) 62 Cal.App.4th 1332, 1336.) When addressing whether a decision impacting land use is consistent with an overall general plan, we ask if the element of the general plan the decision seemingly conflicts with is "fundamental, mandatory and specific." (*Id.* at pp. 1341-1342.)

When courts address a claim of inconsistency between a project and a general plan, "it is important to keep in mind the deferential nature of our review. It is not for us to substitute our judgment for that of a local agency in making a determination of consistency; rather, the agency's determination 'comes to this court with a strong presumption of regularity.' (*Sequoyah Hills Homeowners Assn. v. City of Oakland* (1993) 23 Cal.App.4th 704, 717 [29 Cal. Rptr. 2d 182].)" (*California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603, 638.) When a general plan is in place, it "is the province" of local officials "to examine the specifics of a proposed project to determine whether it would be 'in harmony' with the policies stated in the plan. [Citations] It is, emphatically, not the role of the courts to micromanage these development decisions. Our function is simply to decide whether the [local] officials considered the applicable policies and the extent to which the proposed project conforms with those policies, whether the [local] officials made appropriate findings on this issue, and whether those findings are supported by substantial evidence." (*Sequoyah Hills Homeowners Assn. v. City of Oakland, supra,* 23 Cal.App.4th at pp. 719-720.) "Because an appellate court's task in review of a mandate proceeding is essentially the same as that of the trial court, we review the agency's actions directly and are not bound

by the trial court's conclusions." (*Friends of Lagoon Valley v. City of Vacaville, supra*, 154 Cal.App.4th at p. 816.)

*C. The County's Approval of the Project is Not Inconsistent with The General Plan*

　　*1. Policy 1.A.3.*

Appellants argue that when the County adopted a resolution to amend the Granite Bay Community Plan to change the project site's land use designation from rural low density residential to medium density residential, it impermissibly acted in conflict with Policy 1.A.3. Appellants reason that the modification of the plan is "in direct conflict with Policy 1.A.3," because it "converted" an area previously set aside for "rural low-density residential" to "suburban uses." This reads too much into the requirements of policy 1.A.3. While the policy does require the County to distinguish between rural and urban/suburban areas to identify where development will be accommodated, it does not dictate that the County will never be allowed to change how and where it draws those distinctions. Additionally, (1) the goal the policy is intended to support anticipates the policy will be applied to "meet the present and future needs of Placer County residents"; (2) "[t]he land use designations used in this *General Plan* are intended to generally portray overall land use patterns . . . rather than precisely define the specific land uses appropriate on each parcel of land"; and (3) "[t]he land use policies and standards of the *General Plan* are implemented on a day-to-day basis through zoning, which imposes specific development standards on any proposed land use."

Appellants interpretation of policy 1.A.3. is counter to all three of those mandates in that it renders the policy a straight jacket that prohibits the County from reevaluating and changing the land use designations within Granite Bay. A far more reasonable reading of 1.A.3 is that it requires the County to go through a variety of levels of carefully considered steps--including reviewing and possibly amending the generally defined use of a parcel of land--before it can change how a specific area is being used.

The County did make these careful considerations, and it acted well within its discretion to work within its *General Plan* when it did so.

### 2. Policy 4.E.7

Appellants argue the project is in conflict with policy 4.E.7. To make this argument, appellants try to characterize the project land as rural in nature, citing portions of the EIR that note that pre-development the land was "rural residential" and that Granite Bay overall is "a scenic, tranquil, family-oriented rural/residential community," and noting the pre-project land use designation and zoning were agricultural and rural in nature. But the general mix of land uses in Granite Bay and how the project cite was designated and zoned *before* project approval does not determine how this specific site is zoned *after* project approval. With project approval this specific land was rezoned and designated as medium-density residential. As such, the restrictions in 4.E.7. do not apply, and there can be no conflict.

### D. Land Use Policy 5 is Not Fundamental to the Granite Bay Plan

In arguing that the County's approval of the project violates the planning and zoning laws and the Subdivision Map Act due to an inconsistency with Land Use Policy 5, appellants focus on language in the policy which states subdivision lots "*shall* be adequate in size and shape to accommodate those primary and accessory uses which are in keeping with the particular residential characteristics of the specific location without . . . [¶] [c]reating the need for variances." Appellants reason that the use of the word "shall" makes the requirement mandatory, and, because part of the project approval process involved providing some lots with a variance, the project is inconsistent with the policy. Indeed, the EIR notes that the project is inconsistent with the policy.

However, an inquiry as to whether a particular action violates planning and zoning laws and the Subdivision Map Act does not end when we determine that a project is inconsistent with one particular policy of a plan. Rather, recognizing that projects can

41

rarely be consistent with all of the competing interests contained in a general plan (*Friends of Lagoon Valley v. City of Vacaville, supra,* 154 Cal.App.4th at p. 816), we ask instead whether a decision is consistent with an overall general plan, and focus on if the specific policy with which an action conflicts is "fundamental, mandatory *and* specific." (*Families Unafraid to Uphold Rural etc. County v. Board of Supervisors, supra,* 62 Cal.App.4th at pp. 1341-1342, italics added.)

The EIR notes that, "the Granite Bay Community Plan recognizes the need for a mix of housing densities and more sustainable, efficient use of land while preserving the rural character of the Community." Looking at the nature of the project and its proposed use of building materials and plants, it concludes, "the proposed project would support Community Goal 1 and Goal 3.1.1, which state the County should 'maintain the identity of Granite Bay as a scenic, tranquil, family-oriented rural/residential community compatible with the area's physical constraints and natural features' and 'preserve the unique character of the Granite Bay area which is exemplified by the general rural environment, oak woodlands, mix of land uses and densities, and high quality of development.' " The EIR also observes that project would feature "lot sizes ranging from 7,150 square feet to 17,196 square feet with a mix of one- and two-story homes; therefore, the project would support General Community Goal 13 to 'provide a diversity of housing choices that can support a full range of lifestyles in the community.' "

With respect to the variance for the proposed project, the EIR indicates "the impetus for requesting the Variance is to help alleviate the perceived massing of the project from the perspective of the immediate neighbors, while allowing for larger single-story homes." At the same time, the variance allows the homes to be, "of a size and scale conducive to the character of" the homes to the north and east of the project, consistent with policy 3.2.9 of the *Granite Bay Plan*. Thus, rather than running counter to the overall goals and nature of the *Granite Bay Plan*, allowing the variance actually "furthers the general plan's policies" regarding how development should be accomplished in

Granite Bay. (See *Clover Valley Foundation v. City of Rocklin* (2011) 197 Cal.App.4th 200, 239.) As such, the projects inconsistency with Subdivision Policy 5 is not fundamental. (See *ibid.* ["any inconsistency that exists here is not fundamental. . . . A reasonable person, seeking to implement the general plan's policies of preserving habitat, open space, and scenic vistas, clearly would have concluded the deviation from the buffer zone requirement in this instance better fulfills the general plan's objectives and requirements"].) The County did not abuse its discretion in approving the project.

III

*The County Did Not Abuse Its Discretion in Allowing a Variance for the Project*

A. *Additional Facts*

As part of the steps it took to allow the project to move forward, the County changed the zoning classification of the project site to RS-B-X 7,000. The new classification permits single-family residences on lots with minimum sizes of 7,000 square feet. (See Placer County Code, §§ 17.50.010 & 17.52.040.C.1., available at https://perma.cc/7LNL-YAK9 as of October 28, 2020.) Absent exceptions not at issue here, Placer County zoning provisions limit site coverage by one-story homes on parcels zoned for single-family residential use to a maximum of 40 percent. (Placer County Code, § 17.50.010.E.) Fourteen "deed restricted single-story units on the perimeter of the project" were included in the project proposal "to reduce any feeling of overcrowding that could be perceived by the adjacent properties." Some of those deed restricted lots are less than 8,000 square feet in area. The applicant requested a variance to allow single-family homes on lots under 8,000 square feet to cover up to 50 percent of the lot to allow those deed-restricted residences to "build houses that are similar to the rest of the development" on those lots. The applicant considered other options to develop the property--including maintaining the existing lot sizes and zoning, and building only 40-

43

single family homes--but determined the options that would have resulted in fewer but larger lots were not financially feasible.

In approving the variance, the County found that a "strict application" of the 40 percent maximum coverage requirement on the subject lots would "deprive the property of privileges enjoyed by other property owners in the vicinity and under identical classification." It noted that the "[l]arger single-story homes" the variance would permit would also "be consistent with the size and scale of many homes in the Granite Bay island area." The County also found that granting the variance did not (1) "constitute a grant of special privileges inconsistent with limitations upon other properties" in the area or zoning district; (2) authorize a use of the parcels "that is not otherwise authorized in the zone district;" (3) "adversely affect the public health or safety"; (4) serve as a material detriment to the public welfare; or (5) injure nearby property or improvements. On the contrary, the County found that by allowing for more variety in housing conditions of the project site, including more single-story residences, and thereby reducing "any visual impacts and perceptions of increased density on the project site" the variance "will be beneficial to the health, safety, peace and welfare of the property not only in the vicinity of the project [but] of the County generally."

B. The Variance Was Permissible

Government Code section 65906 only permits variances from the terms of zoning ordinances "when, because of special circumstances applicable to the property, including size, shape, topography, location or surroundings, the strict application of the zoning ordinance deprives such property of privileges enjoyed by other property in the vicinity and under identical zoning classification." Any variance "shall be subject to such conditions as will assure that" it does "not constitute a grant of special privileges inconsistent with the limitations upon other properties in the vicinity and zone in which such property is situated." (Gov. Code, § 65906.) Additionally, a variance cannot

authorize, "a use or activity which is not otherwise expressly authorized by the zone regulation governing the parcel of property." (*Ibid.*) Similarly, Placer County Ordinance Number 16.04.130 provides, "a variance shall be granted only when, because of special circumstances applicable to the property, including size, proposed population, density, shape, topography, location or surroundings, and criteria of the land development manual, a deviation from the provisions of this section would beneficial to the health, safety, peace or welfare of property in the vicinity or of the county generally."

"The granting or denial of a variance rests largely in the discretion of the body designated by the zoning ordinance for that purpose." (*Flagstad v. San Mateo* (1957) 156 Cal.App.2d 138, 140.) When a County approves a variance, "it is presumed that official duty was performed in the making of the required investigation, and that the existence of the necessary facts was found." (*Ibid.*) The courts will not disturb the decision of a local body to grant or deny a variance, "in the absence of a clear and convincing showing of an abuse of discretion." (*Id.* at p. 141.) Additionally, we will defer to the County's interpretation of its own ordinances, which "will be accorded great respect by the courts and will be followed if not clearly erroneous." (*Eskeland v. City of Del Mar* (2014) 224 Cal.App.4th 936, 946, citations and quotations marks removed.)

Here, the County made appropriate findings to support the variance: given the size and deed restrictions of these lots, strict application of the coverage requirements would deprive the owners of the ability to build homes of a similar size and scale of the homes of their neighbors; and the single-story deed restriction that gives rise to the need for the variance is beneficial to public because it reduces a sense of massing and overcrowding in the area.

Appellants challenge the County's determination by arguing the existence of lot sizes that--if no variance were granted--would restrict single-story home sizes to homes that are not commensurate in size with other area homes is a hardship "created . . . through the design of the project" and that, as such, a variance was not really required.

The appellants point out that "the need for a variance is the result of the developer's actions in dividing the property," suggesting that developer cannot now seek and the County cannot now approve a variance when they could have created larger lots on the project site. Citing *Town of Atherton v. Templeton* (1961) 198 Cal.App.2d 146 (*Atherton*), appellants argue a "self-induced hardship does not constitute grounds for granting a variance." Yet, as the trial court aptly observed, the instant case is readily distinguishable from *Atherton*.

In *Atherton* property owners sought a variance that would allow them to construct a tennis court in their front yard. (*Atherton*, *supra*, 198 Cal.App.2d at p. 149.) At the time the owners sought the variance, they owned sufficient land to construct the tennis court on an area of the property that was not their front yard, and therefore where construction would not run afoul of the ordinance. (*Id.* at p. 154.) However, after they applied for the variance, they sold some of the land, thereby creating the situation where they would only have sufficient room for a tennis court in their front yard. (*Ibid.*) After the city denied their request for a variance, the property owners built the tennis court anyway, "in willful disregard of the ruling." (*Id.* at p. 149.) The Town of Atherton then sought and was granted a judgment permanently enjoining the owners from maintaining the tennis court and ordering them to remove the structure. (*Id.* at p. 148.) On appeal, the owners argued the Town of Atherton improperly denied the requested variance, but the court disagreed, reasoning, "[s]ince the facts in the instant case clearly reveal that any hardship suffered by appellants is the result of their own actions in deliberately disposing of land on which the tennis court could properly have been built, there can be no question that the planning commission acted properly in denying them a variance." (*Id.* at p. 154.)

In contrast to the facts at issue in *Atherton*, this case is not in a posture where the variance applicant openly disobeyed an ordinance. Moreover, in *Atherton* the court was considering if a local entity correctly *denied* a variance, here we are considering if a local entity correctly *granted* a variance. Based on these two significant factual differences, it

is simply too far a stretch to say that *Atherton* compels the conclusion that the County improperly allowed a variance here simply because it is conceivable that the developer could have drawn property lines so that all of the deed restricted parcels could have been deed restricted and still allowed for the construction of single story homes that are both of a similar size as other homes in the area and within the 40 percent cap on lot coverage.

Additionally, the fact it was in theory possible for the lots to be drawn in a way that obviates the need for the variance does not mean, as appellants suggest, that substantial evidence does not support the granting of the variance. In *Eskeland v. City of Del Mar, supra,* 224 Cal.App.4th at pages 939, 953-954, the court upheld a city's granting of a variance related to property setbacks to an owner building a home, even though, technically speaking, the owner could have built the home without the variance. The court reasoned, "we also understand the Eskelands to be advancing the position that because it was physically possible for Scurlock to build a house that complied with the front yard setback requirement, Scurlock should have been required to do so, despite the degree of difficulty or expense involved and despite any other negative consequences of such a design. That is not the law. For one thing, the increased expense involved in developing a lot that poses topographical challenges is properly considered when deciding whether a variance is warranted." (*Eskeland v. City of Del Mar, supra,* 224 Cal.App.4th at pp. 953-954.) Here too the County and the trial court properly considered the financial infeasibility of dividing the lots in a manner that would avoid the need for a variance.

Appellants also argue the County impermissibly granted the variance due to its inconsistency with Land Use Policy 5. As we concluded above, Land Use Policy 5 is not a fundamental policy of the *Granite Bay Plan* and this inconsistency is allowed.

## IV

### *The Project Does Not Violate the California Fire Code*

The only regular ingress and egress to the project site will be provided by "a single gated access at the project's midpoint along Sierra College Boulevard," which runs along the east side of the project site. Yet section D107.1 of Appendix D to the California Fire Code, requires all "[d]evelopments of one- or two-family dwellings where the number of dwelling units exceeds 30" to have "two separate and approved fire apparatus access roads." Placer County has adopted the California Fire Code and its appendices through Placer County Code section 15.04.510.

To satisfy the requirement for two fire access roads, the project site would have, "a gated secondary access point to Eckerman Road that would be available for use only by emergency vehicles or by area residents during an emergency." Eckerman Road, which runs along the western edge of the property, is a private road that has been developed as a residential roadway varying in width from approximately 13 feet to 20 feet, and it ends in a cul-de-sac near the midpoint of the western edge of the project site.

Appellants argue that the proposed emergency access point does not satisfy the requirements of the California Fire Code. Appellants argue Eckerman Road cannot serve as a fire access road because it is too narrow, citing table D103.4 of Appendix D of the California Fire Code. Table D103.4 dictates fire apparatus access roads that are dead-end roads must be at least 20 feet wide. But in the event of an emergency that requires Eckerman Road to be used for fire access, the gated entrance would be open, leading traffic into the project site where it could flow through the project site and out to Sierra College Boulevard. The requirements of table D103.4 do not apply because the emergency access road would not be a dead-end road.

Appellants also argue that Eckerman Road cannot be used as an emergency access road for the project, because the project site lacks an easement that contemplates

emergency access use for a community of 56 residences.  But the project proposal specifically circumscribes the use of Eckerman Road to emergency situations.  That is, project residents and emergency service providers will only be using Eckerman Road when it is necessary to preserve life or property.  Common law recognizes that "[n]ecessity often justifies an action which would otherwise constitute a trespass, as where the act is prompted by the motive of preserving life or property and reasonably appears to the actor to be necessary for that purpose."  (*People v. Roberts* (1956) 47 Cal.2d 374, 377; see also Rest.2d Torts, § 197.)  Because emergency vehicles and project residents would only use Eckerman Road out of necessity in the case of an emergency, we need not consider the scope of any easements to use Eckerman Road that might run with the project site.

## DISPOSITION

The judgment is affirmed.

_____

HULL, Acting P. J.

We concur:

_____

ROBIE, J.

_____

MURRAY, J.